Filed 9/27/21  In re K.W. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FIVE

| | |
|---|---|
| In re K.W., et al., Persons Coming Under Juvenile Court Law. | B309940 |
| _____ | (Los Angeles County Super. Ct. No. 20LJJP00528A-E) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| B.W., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Michael Kelley, Judge.  Affirmed.

Jill Smith, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Deputy County Counsel, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Mother appeals after the juvenile court assumed jurisdiction over her five children pursuant to Welfare and Institutions Code section 300, subdivision (b), and ordered family maintenance services.[1] Mother challenges both the jurisdiction and the disposition orders. As to the former, she contends that there was insufficient evidence that her mental health problems interfered with her ability to provide regular care and supervision of the children. She asserts the court abused its discretion in its disposition by ordering her to participate in counseling, mental health services, parenting classes, and limited drug testing. We affirm.

*FACTUAL AND PROCEDURAL BACKGROUND*

**1.    *Mother's Mental Health Problems***

The family consists of mother, father, and their five children (born 2009, 2011, 2013, 2016, and 2019). Mother and father had been together for 11 years. Mother (32 years old) had a traumatic childhood, during which her own mother abandoned her (at age 15) for drugs, and mother's biological father neglected her. By the summer of 2020, the COVID-19 pandemic cut mother off from the spiritual support she had been receiving at her church, and mother's childhood trauma surfaced to impact her daily functioning. The parents also struggled with their relationship and finances. Mother experienced ongoing thoughts of hurting herself.

On June 23, 2020, mother sought psychiatric care, and was diagnosed with depression and bipolar disorder. During her intake evaluation, she denied alcohol use but admitted to quitting methamphetamine 11 years earlier. She denied prior psychiatric

_____

[1]    All subsequent statutory references are to the Welfare and Institutions Code.

hospitalizations but reported her mother and brother had a history of mental illness. The psychiatric evaluator included this in her comments on mother's judgment and insight: "Unrealistic Decisions" and "Insight, Poor." Mother reported symptoms of depression, isolation, crying, anxiety, monthly panic attacks, insomnia, worry, racing thoughts, rumination of thought, anger, nightmares, yelling, cursing, breaking things, "poor ADLs" (activities of daily living), moodiness, feeling bad about herself, appetite concerns, little energy, trouble concentrating, irritability, and trouble relaxing. Mother said these symptoms had been recurring for five years. She began to take prescribed Zoloft for depression. The treatment provider noted mother likely needed a mood stabilizer, which would be addressed at the next session.

### 2. *Mother's Apparent Suicide Attempt*

On July 9, 2020, around 11:00 p.m., the parents had been drinking and mother became angry when father made a comment about how mother was dancing. Mother declared she no longer wanted to be on this earth, and put 10 to 15 Zoloft pills in her mouth, allegedly to scare father. She immediately spit out some or all of the pills.[2] Mother had made suicidal statements previously but had never acted on them. The children did not see these events but were nearby in their bedrooms.

Father called 9-1-1, and initially stated: "My wife suicide . . . ." According to the transcript of the 9-1-1 call: Father provided his address and told the dispatcher that mother "just took a bunch of pills down her throat right now." Father then indicated that mother spit them out but he did not know if she ingested some. Father reported mother had walked away from

---

[2] Father was not sure if mother spit out all the pills and said she could have consumed two to three pills.

3

him and was in another room. During the call, mother was recorded in the background saying to father that she was never going to talk to him again. Father tried to console a crying child in the background.[3] Father then told mother that she did not need to take his keys, and mother told him that they were her keys.

The transcript continued: Mother told father, " 'I'm not going to a mental ward because of you. Your baby . . . kids are just crying their fucking heads off.' " Mother told father that their relationship was over, and father replied he was not concerned about that and wanted mother " 'to be better.' " Mother repeated that she and father were " 'over' " and then said, " 'Mommy is going to be going.' " The dispatcher advised father to stay away from mother so that she did not attack him, and Father acknowledged the advice and said alcohol was involved. Father told mother that she did not need to take the baby, and mother indicated she was just saying goodbye to her and told the child that she hoped father could take care of her. Mother walked out of the home and was gone for a short while. Father went looking for her with a flashlight. The call ended as police arrived.

By the time law enforcement arrived, Mother had returned to the home. Mother denied wanting to hurt herself and said she wanted to be there for her children. Father reported to the first responders that mother had made suicidal statements in the past but had never acted on them and never threatened to harm the children. While holding her youngest child, mother refused to go to the hospital for evaluation. The officers did not force the issue out of concern that the situation would escalate or the child

---

[3] It appears that the youngest child, who was about 15 months old at this time, was crying throughout the call.

4

would be injured.  Law enforcement concluded that mother was not a danger to herself or others, and left.

### 3.    *DCFS Investigation*

Following law enforcement's investigation of mother's apparent suicide attempt, DCFS received referrals indicating the family was in need of services.  Mother told the investigating social worker that she had recently started taking a generic form of Zoloft, and it had been an adjustment for her.  Mother believed the medication was not yet fully effective, and she had thoughts of hurting herself.  Mother said she had also started therapy.  Mother denied that she intended to harm herself when she took the pills on the night of July 9th.

Father told DCFS that this was the first incident of this nature and suggested that if mother had wanted to take her life, she would not have made the attempt when he was home.  Father reported that the children were aware generally of what had happened.  He told them that the fire trucks came to make sure mother was okay.  He did not want them to know the details of the incident as they were too young.  Father referred to mother's actions as " 'a call for help.' "  He told DCFS that mother's medication was working now, mother seemed happy, and she was no longer isolating herself in her room.

All five children appeared well cared for.  The eldest reported feeling safe at home and that mother took good care of her and her siblings.  Mother did all the cooking and cleaning.  The eldest child also stated that father worked long hours and slept when he was home.  The child reported the parents would argue but never physically hit each other.  The parents' arguments confused her but did not make her feel unsafe.  The six-year-old daughter likewise reported feeling safe with the parents and that she was not afraid on the day of the incident.

5

The other children did not make meaningful comments due to their age or shyness.

Mother's psychiatrist reported mother was a fairly new patient. At this stage of treatment, medication often needed adjustment. The psychiatrist would continue to monitor and adjust mother's medication as needed. The psychiatrist was not concerned about mother's present ability to provide care and supervision for the children.

### 4. *Section 300 Petition; Jurisdiction and Disposition Hearing*

On August 24, 2020, DCFS filed a section 300 petition that included allegations that the children were at risk due to mother's mental and emotional problems and her recent attempt to harm herself.

On November 3 and 19, 2020, the juvenile court adjudicated the section 300 petition. The court admitted the DCFS reports, which included a transcript of the 9-1-1 call. Mother testified to facts stated above.

The attorney for DCFS argued an amended petition should be sustained, asserting the 9-1-1 transcript showed mother was unable to care for the children or herself and that father appropriately intervened. He told the court the children had witnessed the incident. The negative impact of the events on the children was confirmed by their crying and the need for father's consolation. The children's attorney agreed to an amended version of the petition and expressed concern that the parents had "attempt[ed] to downplay the incident" in their DCFS interviews. The attorney pointed out that mother previously had admitted a history of suicidal thoughts, and the evidence was inconsistent on whether mother swallowed some of the pills.

Mother's attorney argued mother showed poor judgment and immaturity, but did not rise to the level for the court to

assume jurisdiction. He argued for dismissal of the petition as the children were well-cared for and not at risk. Father's attorney joined in mother's argument.

The juvenile court found true by a preponderance of the evidence an amended version of the section 300, subdivision (b)(1) allegation, which stated:

> "[Mother] has mental and emotional problems including a diagnosis of Bipolar II Disorder, Depression, which interferes with mother's ability to provide regular care and supervision of the children. On 7/9/20, the mother took 10 to 15 pills in an attempt[ ] to harm herself due to mother's mental health issues. The mother failed to take the mother's psychotropic medication as prescribed. The mother failed to participate in consistent mental health treatment. Such mental and emotional problems on the part of the mother endangers [sic] the children's physical health and safety and places the children at risk of serious physical harm, damage, danger and failure to protect."

The court explained its reasoning: "I start with the best evidence [of] what was happening, which is the transcript of the 911 call. And I have to say that anyone who cares about children would have to be chilled by the scene that played out as according to the transcript. And while I understand that there is evidence that mother may not have had a rational plan to commit suicide, that's certainly what father thought, which is what he said in the first statement he made to the 911 operator, something about suicide." The court continued: "I'm also very aware that the clear evidence of what triggered this was a relatively modest disagreement. Father made some negative remarks about the way mother was dancing. If that kind of a situation can create the situation that spiraled the way it did on July 9th, then there is a concern that some of the normal stress of family living today could trigger another episode. And I think that puts the children

7

at risk. I also note that one of the children was in mother's arms at certain times during this incident. Children were awakened. [¶] And even though father is appropriately removed from the [section 300] count on a failure to protect basis, I don't believe we can assume that mother, with her current challenges for mental and emotional health, would be able to fully care for the children."

The juvenile court declared the children dependents and ordered that they remain in the parents' custody. The court ordered family maintenance services and a treatment plan for the family. When asked if he wanted to be heard regarding the case plan proposed by DCFS, mother's attorney replied, "Submitted, Your Honor."

The juvenile court ordered both parents to attend parenting instruction, conjoint counseling, and individual counseling to address mental health issues, protective parenting, and effective communication. The court ordered mother to provide four random or on-demand drug tests. DCFS was to drug test father if there was suspicion of use. The court ordered the three oldest children be assessed for counseling.

Mother filed a timely notice of appeal.

## DISCUSSION

### 1. Substantial Evidence Supports Jurisdiction

The juvenile court found the children dependent under section 300, subdivision (b)(1). That subdivision provides, in part, that a child may be declared dependent if "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has

8

been left. . . ." (§ 300, subd. (b)(1).) "A jurisdictional finding under section 300, subdivision (b)(1), requires [DCFS] to demonstrate the following three elements by a preponderance of the evidence:  (1) neglectful conduct, failure, or inability by the parent; (2) causation; and (3) serious physical harm or illness or a substantial risk of serious physical harm or illness." (*In re L.W.* (2019) 32 Cal.App.5th 840, 848.)

"We review the juvenile court's jurisdictional findings for sufficiency of the evidence.  We review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  However, substantial evidence is not synonymous with any evidence.  . . .  [W]hile substantial evidence may consist of inferences, such inferences must be a product of logic and reason and must rest on the evidence [citation]; inferences that are the result of mere speculation or conjecture cannot support a finding." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 763 (internal quotation marks and citations omitted).)

Here, by her own admission, mother had significant mental health problems, including suicidal ideation, for five years.  Only recently had she sought psychiatric care for her condition.  Three weeks before the pill incident, she was diagnosed with depression and bipolar disorder.  The juvenile court reasonably found that mother's mental health problems impacted her daily living activities and fostered her poor judgment.  As the trial court pointed out, mother engaged in a suicidal act in response to mere comments from father about her dancing.  That she spat out some or all of the pills did not remedy mother's severe reaction to the situation and poor judgment.

The transcript of 9-1-1 call and the police report confirmed that mother's mental health problems interfered with her ability to care for the children. With the children awakened and the baby crying during the parents' argument, mother displayed callousness for the children's emotional and physical wellbeing. She stated "Mommy is going to be going," and told one child that she hoped father could take care of the child. After police arrived, mother placed the baby in possible danger by holding the child when law enforcement wanted to detain mother.

The trial court aptly assessed that the triggering event was a "relatively modest disagreement. Father made some negative marks about the way mother was dancing. If that kind of a situation can create the situation that spiraled the way it did on July 9th, then there is a concern that some of the normal stress of family living today could trigger another episode." Given that mother was the children's primary caretaker – father worked long hours and slept when home – the court reasonably found that her conduct illustrated a significant and real danger to the children in her care.

Mother argues the finding of risk was unsupported and cites *In re James R.* (2009) 176 Cal.App.4th 129, 136 (*James R.*). In that case, the mother took eight ibuprofen tablets while drinking beer. (*Id.* at pp. 131-132.) When the mother realized she was having an adverse reaction, she called for help and was hospitalized. (*Id.* at p. 132.) The evidence showed she was not suicidal and did not intentionally try to harm herself, but took a large dose of ibuprofen for pain relief since she had built up a tolerance for acetaminophen (generic Tylenol). (*Ibid.*) Both the mother's psychiatrist and the social worker working with mother opined that the mother did not pose a risk to her young children. (*Id.* at pp. 133-134.) The parents lived together, and the father at all times had been able to provide adequate care for the children.

10

(*Id.* at p. 134.) The appellate court reversed the juvenile court's findings that under section 300, subdivision (b), the mother's supposed mental health problems and substance abuse endangered her children. (*Id.* at p. 137.)

We find the facts of this case significantly differ from those in *James R.* The evidence here showed that mother had a history of suicidal thoughts, engaged in recent intentional dangerous behavior, and demonstrated seriously poor judgment, all in the presence of the children.

The present case involves the substantial risk prong of section 300, subdivision (b)(1) – the children were not physically harmed. Risk assessment requires the application of facts to predict possible future events. It is short of provable science. In dependency cases, the juvenile court is initially tasked with that assignment. The substantial evidence standard of review mandates that an appellate court defer significantly to the juvenile court's assessment of that risk. This is especially so in cases, such as this one, when the person whose conduct is implicated testifies, and the witness's demeanor may be assessed by the trier of fact. What is not required is proof that actual physical harm has already occurred. And for good reason. "The idea that state authority can be mobilized only after the fact is untenable. Power is not disabled from dealing with latent risk. The state, having substantial interests in preventing the consequences caused by a perceived danger is not helpless to act until that danger has matured into certainty. Reasonable apprehension stands as an accepted basis for the exercise of state power." (*In re Eric B.* (1987) 189 Cal.App.3d 996, 1003.)

The juvenile court expressly found that "mental and emotional problems on the part of the mother endangers [sic] the children's physical health and safety and places the children at

11

risk of serious physical harm, damage, danger and failure to protect." We conclude substantial evidence supports that finding.

## 2. *The Court Did Not Abuse Its Discretion in Ordering Family Maintenance Services*

Mother argues that the court abused its discretion in ordering family maintenance services.[4] We first observe that mother failed to object to the case plan proposed by DCFS. "[T]he failure to object to a disposition order on a specific ground generally forfeits a parent's right to pursue that issue on appeal." (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345.) Even if we were to consider mother's arguments on the merits, we would conclude there was no abuse of discretion.

"If a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child . . . ." (§ 362, subd. (a).) "The trial court has broad discretion to make virtually any order deemed necessary for the well-being of the child . . . ." (*In re Sergio C.* (1999) 70 Cal.App.4th 957, 960.) "At disposition, the juvenile court is not limited to the content of the sustained petition when it considers what dispositional orders would be in the best interests of the children. [Citations.] Instead, the court may consider the evidence as a whole." (*In re Briana V.* (2015) 236 Cal.App.4th 297, 311.)

---

[4]  In her opening brief, the heading for mother's argument that this court should reverse the dispositional order suggests her contention is limited: if jurisdiction is reversed so, too, must the dispositional order. But the text of mother's discussion also contains arguments directed to individual elements of the family maintenance plan. Accordingly, we address those points as well.

12

Here, the juvenile court ordered mother to participate in individual and psychiatric counseling, conjoint counseling with father, parenting instruction, and four random drug tests. Mother's psychiatric care and counseling were clearly supported by the record of her mental health problems. Her therapist recommended therapy. The July 2020 pill incident, which caused the children distress and showed mother's poor judgment (even if not a suicide attempt) supports the court's decision to order parenting instruction. Mother's history of methamphetamine use (even though remote) and consumption of alcohol, which played a role in the July 2020 incident, support the limited drug testing ordered by the court. The pill incident was an abuse of prescribed medication, further supporting drug testing.

## DISPOSITION

The court's jurisdiction and disposition orders are affirmed.

RUBIN, P. J.

WE CONCUR:

BAKER, J.

KIM, J.

13